JOHNSON KING et als. v. NATHAN SCOGGIN et als.

*Reversions and Remainders—Descents.*

1. Where a reversion or remainder, expectant upon a freehold estate, comes by descent, and the reversioner or remainderman dies during the continuance of the particular estate, a person claiming the estate by inheritance must make himself heir to the original donor who erected the particular estate.

2. Where the reversion or remainder comes by descent and is conveyed by deed or devise to a stranger, before the determination of the particular estate, the donee takes by purchase, and the estate will descend to his heirs.

3. Where the remainder or reversion is acquired by purchase, one claiming the estate by descent must make himself heir to the first purchaser of the remainder or reversion at the time when it comes into possession.

4. So where an estate was devised to M for life, remainder to G in fee, and G died in lifetime of M ; *Held*, that, as G took the remainder by purchase, it descended to his heirs, although he was never actually seized, and not to the heirs of the devisor.

(*Lawrence* v. *Pitt*, 1 Jones, 344, explained and approved).

This was a CIVIL ACTION for the recovery of land tried before *MacRae, J.*, and a jury, at Spring Term, 1884, of RUTHER-FORD Superior Court.

The facts are as follows:

George Hay, Sr., owned the land in dispute and was in possession from 1815, and conveyed the same to George Hay, Jr., his son, in 1838 in fee, and died in 1840. George Hay, Jr., was in possession until his death in 1842. George Hay, Sr., had three children, James, Sarah and George, Jr. James went away thirty years ago and never was heard of. Sarah married George Suttle and died, leaving two children, Sarah and Mary, who are the plaintiffs Sarah King and Mary Webb. George Hay, Jr., married Martha Wesson, who, before her marriage, had two illegitimate children—there were no children after the marriage. The two illegitimate children were named Mary Wesson and George Wesson, *alias* Hay.

George Hay, Jr., devised the land as follows:

"I give and bequeath to my beloved wife Martha the tract of land whereon I now live, for her to hold and enjoy during her natural life or widowhood, and at her death or marriage, to my beloved son George Hay, *alias* Wesson."

Martha Hay remained a widow and continued in possession until her death in 1858 or 1859.

George Hay, *alias* Wesson, died in the lifetime of his mother in 1850, unmarried and without issue, leaving a sister, Mary Wesson, the other illegitimate child of Martha.

The defendants claim as follows:

1st. By deed from George W. Suttle and wife Mary, who was the illegitimate daughter of Martha Wesson, afterwards wife of George Hay, Jr., executed 25th March, 1861, to Benjamin Washburne, in fee simple.

2nd. Deed from Mary Suttle (daughter of Sarah), now Mary Webb, plaintiff, to Mary Suttle, wife of George W. Suttle, 21st of March, 1860. Defendants contend that this deed conveyed an estate in fee simple.

The presiding judge held that it conveyed only a life estate. Defendants excepted.

It is admitted that Mary, the wife of George W. Suttle, died before this action was begun.

The plaintiffs claim that George Wesson, *alias* Hay, having died during the life of his mother, Martha Hay, the life tenant, the inheritance descended to them as the only surviving heirs of George Hay, Sr., and George Hay, Jr., under the rules of descent, Revised Statutes, ch. 38, §6, which required actual seizin in the person from whom the estate descended.

The defendants, who are the heirs of Benjamin Washburne, claim that the freehold and inheritance having passed by the devise of George Hay, Jr., and vested for life in Martha Hay, with remainder in George Wesson, that they took the estate by purchase, and that the inheritance vested in George Wesson, and upon his death descended to Mary Suttle, his sister, and only heir-at-law, who, with her husband, George W. Suttle, had con-

veyed the same by deed to their ancestor, Benjamin Washburne, in fee.

The presiding judge, being of opinion with the plaintiffs, instructed the jury that, upon the evidence the plaintiffs were entitled to recover. Defendants excepted.

Judgment for plaintiffs. Defendants appealed.

*Messrs. J. A. Forney* and *W. P. Bynum*, for plaintiffs.
*Messrs. M. H. Justice* and *Hoke & Hoke*, for defendants.

ASHE, J. George Hay, the owner of the fee-simple of the land in controversy, devised it to his son, George Hay, Jr., who occupied it until his death in 1842.

George Hay, Sr., had three children, James, Sarah, and George, Jr. James, it is supposed, died many years ago without issue. Sarah married one Suttle, and had two children, Sarah and Mary, who are the four plaintiffs in this action.

George Hay, Jr., married Martha Wesson, who, before her marriage, had two illegitimate children, George Wesson and Mary Wesson, and none after marriage. George Hay, Jr., left a will, in which he devised the land to his wife Martha for life, and, after her death, to his son, George Wesson, in fee. George Wesson died during the continuance of the life estate of his mother, Martha.

The plaintiffs claim the land as the heirs of George Hay, Jr., the person last actually seized of the land, contending that as George Wesson died during the continuance of the particular estate, and consequently never having had actual seizin, the land descended upon his death to the heirs of George Hay, Jr., who created the remainder in George Wesson, and was the person last actually seized of the land in fee-simple.

The defendants claim under the deeds of conveyance from Martha Webb, the plaintiff, and Mary Suttle, the illegitimate daughter of Martha Suttle, the wife of George Hay' and sister of George Wesson.

We deem it unnecessary to inquire whether the defendants had any title to the land. The plaintiffs must recover upon the strength of their own title, and we, therefore, proceed to address ourselves to the question whether the plaintiffs have title.

This question is not free from difficulty, but the complexity of the subject is mainly attributed to confounding the estates of reversions and remainders, which, though having some resemblance to each other, are quite distinguishable. Blackstone defines a remainder to be an estate limited to take effect and be enjoyed after another estate is determined; and it not only requires a particular estate to support it, but it must vest in the grantee during the continuance of the particular estate, or *eo instanti* that it determines. 2 *Blackstone,* 163—168. The same author defines a reversion to be "the residue of an estate left in the grant, to commence in possession after the determination of some particular estate, granted out by him. A reversion is, therefore, not created by deed or writing, but arises from construction of law. A remainder can never be limited unless either by deed or devise." *Ibid,* 175–6.

There is a marked difference in some of their incidents, notably in the liability for debts, and in the modes of descent. A remainderman was not liable for the debts of the grantor from whom he derived the estate, whilst a reversioner was bound to pay his ancestor's specialty debts, to the extent of the value of his reversion; and at common law a reversion descends like the old inheritance, of which indeed, it is a part, in the same line therewith and keeping to the blood of the *same first purchaser;* whilst a remainder is a new estate, acquired by purchase, and passes in the line of a new purchaser, 2 *Minor's Institutes,* page 442, and this position is supported by *Sir Wm. Blackstone,* who lays down the doctrine, that "If one seized of a particular estate in fee, makes a lease for life with reversion to himself and his heirs, this is properly a mere reversion, to which rent and fealty shall be incident, and which shall only descend to the heirs of his father's blood and not to his heirs general, as a remainder limited

to him would do. 2 *Blk.*, 176. This seems to be a clear recognition of the doctrine, that when one owning the fee simple conveys it to one for life, remainder to another, that remainderman takes by purchase and becomes a new *stirps* of the inheritance; and we think that is the principle to be gathered from the authorities.

The counsel for the plaintiffs seems to have relied chiefly upon the decision of *Lawrence* v. *Pitt*, 1 Jones, 344, which was decided before the rule was changed, which required that "Inheritance should lineally descend to the person who died last actually seized." But it is no authority for the position maintained by the defendants' counsel. The decision in that case was right.

There the person owning the estate in fee simple, and actually seized thereof, died leaving several children. His widow had dower assigned her in the parcel of land in controversy. Upon a partition among the children, the portion allotted to one of the daughters was covered by the dower. This daughter died before the widow, leaving a grandson who died without issue, and his father, the plaintiff, claimed the land under the provision of the the rule of descent, *Revised Statutes, chapter* 38. It was held that he could not recover, for his son was not heir to his grandmother, because she was never actually seized of the estate in fee simple. The court held the rule to be, as to reversions and remainders expectant upon estates in freehold; "That unless something is done to intercept the descent, they pass when the particular estate falls in, to the person who can make himself heir of the original donor, who was seized in fee and created the particular estate, *or if it be an estate by purchase, the heir of him who was the first purchaser of such reversion or remainder.*

In laying down the rule, the court omitted one very important element of the rule, to wit, when the remainder or reversion comes by descent, as it was in that case, all the authorities agree that, where there is an estate for life and remainder over, and the remainderman dies pending the particular estate, the estate descends to the donor who erected the particular estate, or

to him who can make himself heir to such donor; but this is only when the remainder, like the reversion, comes by *descent*, as was the case in *Lawrence* v. *Pitt, supra.* It is true, remainders are created by deed or writing, but the estate is sometimes created so that what is called a remainder is, in effect, only a reversion; as, for instance, when an estate is given to one for life, remainder to the right heirs of the grantor (2, Washburn on Real Property, 692; Burton on Real Property, 51), and this must be the kind of remainder classed with reversions which go to the donor or to him who can make himself heir to him; but it cannot be that when the owner of the fee conveys it by deed, or will, to one for life and after his death to another in remainder in fee, that the estate could under any circumstances return to the donor, for he has parted with all his interest, and according to the rule as laid down by the Court in *Lawrence* v. *Pitt,* the person who claims the estate must make himself heir to the remainderman who is the *first purchaser of the remainder.* Because being the first purchaser of the remainder, he thereby becomes a new stirps of the inheritance.

The distinction lies in acquiring the remainder or reversion by descent or purchase. In the one case it goes to the donor who who created the estate, for it is the *old inheritance,* and in the other it goes to the heirs of the remainderman, because his estate was acquired by purchase, and falls into a new line of descent. This distinction is recognized by all the authorities. Washburn in his work on Real Property, Vol. 3, p. 13, uses this language: "As there can be no actual seizin and possession of a remainder or reversion dependent upon a particular estate of freehold, although the same will descend through a line of successive heirs until the estate vests in some one in possession, the rule of the common law seems to be this: If such remainder or reversion comes *by descent* from the donor of the particular estate who created the same, the person who claims it when it vests in possession must trace his descent from the donor who was last actually seized, irrespective of all who in the meantime may have been

·entitled to the same as heirs, the donor or creator of the particu-
lar estate being the the stirps from which the descent of the one
who is to take, is to be traced.   But it would be competent for
any one to whom such right had descended to have sold it or
·divided it, whereby the grantee or devisee, as purchaser, would
have constituted a new stirps, and he would take the estate, when
it vested in possession, who could trace the descent to himself
from such new stirps."

   Judge Kent says, "It is a well settled rule of the common law
that if the person owning the remainder or reversion expectant
upon the determination of a freehold estate, dies during the con-
tinuance of the particular estate, the remainder or reversion does
not descend to his heir, because he never had a seizin to render
him the stock or terminus of an inheritance."   The learned
Judge in this passage evidently has reference to such reversions
and remainders as come by decent, for he proceeds to add as a
part of the rule, "The estate will descend to the person who is
heir to him who created the freehold estate, *provided the remain-
der or reversion descends from him;* or if the expectant estate had
been *purchased,* then he must make himself heir to the *first pur-
chaser of such remainder or reversion,* at the time when it comes
into possession.   The purchaser becomes a new stock of descent,
and on his death, the estate passes directly to his heirs at law."
With only slight variation in the phraseology, is the rule laid
·down by Beverly, Judge, in the case of *Vanderheyder v. Crandall,*
2 Den., 24, which is as follows: "It is a well-known rule in the
law of descent, that a reversion or remainder, expectant on a free-
hold estate, will not, during the continuance of such freehold
·estate, pass by descent from a person in whom a title thereto had
*vested by descent,* as a new stock of inheritance, unless some act
·of ownership which the law regards as equivalent to an actual
seizin of a present estate of inheritance had been exercised by the
·owner over such expectant estate.   But it is otherwise when the
future estate was acquired by purchase, because the purchaser
becomes a new stock of descent, and on his death the estate
passes directly to his heirs at law."

We understand what is meant by the qualification of the rule expressed in the sentence, "unless some act of ownership which the law regards as equivalent to an actual seizin," is when the reversioner or remainderman, to whom the estate has come by descent, conveys his estate to a stranger, he is a purchaser and as such becomes the stirps of a new stock of descent, and any one claiming the land after his death must make himself heir to him and not to the original donor from whom the estate was originally derived. The conveyance takes the estate out of the old line of inheritance and puts it in one entirely new. That being so, *a fortiori* is the effect of a conveyance by deed· or devise from the original owner to one for life, remainder in fee to a stranger, where the absolute estate is parted with.

The rules above cited would seem to embody these three propositions,

(1) When the reversion or remainder expectant upon a freehold estate comes by descent, and the reversioner or remainderman dies during the continuance of the particular estate, he who would claim the estate by inheritance, must make himself heir to the original donor, who erected the particular estate, for it is the old inheritance;

(2). Where the reversion or remainder comes by descent, and before the determination of the particular estate it is conveyed by deed or devise to a stranger, the donee takes by purchase; he becomes a new stock of descent and the estate will descend to his heirs.

(3). Where the remainder or reversion is acquired by purchase, then he who would claim the estate, must make himself heir to the first purchaser of the remainder or reversion at the time when it comes into possession; for the remainderman or reversioner, by such purchase, has becomes a new stirps of descent.

This last proposition, in addition to the authorities already cited, is supported by the following: In *Doe* v. *Hutton*, 3 Bos. & Pul., 650; Lord Alvanly, C. J., in speaking of reversions and remainders, after citing numerous authorities uses this language :

"These, and many other cases which I shall forbear to mention, prove that where there is an intermediate estate (freehold), there is no seizin, though as I before observed, if a man purchase a reversion expectant upon a freehold, it will descend to his heirs, though it has never come into possession;" and *Burton on Real Property*, p. 48, thus mentions the same doctrine. "If a person has purchased, *i. e.* acquired by conveyance or devise, lands and tenements in fee simple, of which from the nature of the estate he cannot obtain seizin, these on his intestacy will descend to his heirs. Of such a nature is a remainder expectant upon a particular estate of freehold, and this remainder, vesting in the heir by descent, will not, if it remain untolled, descend to his heir, as such, but still to the heir of the first purchaser," which we find thus illustrated by another author: "If A, the reversioner, remainderman, or executory devisee died before the event which brought the interest into possession, such interest did not so attach in B the then heir of A, as to carry it upon B's death to C the heir of B; but D the heir of A at the time of the interest falling into possession was entitled." *Hubback on Evidence of Succession*, 136; *Cap.*, 15a; *Butler's Note*, 6.

Our conclusion is, the plaintiffs cannot establish a title to the land in controversy by claiming as heirs of George Hay, Jr., and are, therefore, not entitled to recover in this action.

The judgment of the Superior Court is, therefore, reversed, and judgment must be entered here that the defendants go without day and recover the costs of the appeal.

Error.                                                          Reversed.